**NOT FOR PUBLICATION**

```
           UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
_____
                                :
QURAN MCCLARY,                  :
                                :  Civil Action No. 07-2136 (KSH)
            Petitioner,         :
                                :
       v.                       :       O P I N I O N
                                :
MICHELLE RICCI, et al.,         :
                                :
            Respondents.        :
_____:
```

**APPEARANCES:**

Quran McClary, <u>Pro</u> <u>Se</u>  
#275402/ #136466-C  
New Jersey State Prison  
P.O. Box 861  
Trenton, NJ 08625

Johanna Barba Jones, Esq.  
Office of the Attorney General  
25 Market Street, P.O. Box 086  
Trenton, NJ 08625  
Attorney for Respondents

**HAYDEN**, District Judge

      Petitioner Quran McClary, a prisoner currently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The respondents are prison administrator Michelle Ricci and the New Jersey Attorney General.[1]

      For the reasons stated herein, the petition must be denied.

---

[1] Respondents have requested that Anne Milgram, the current Attorney General of New Jersey be substituted as a party in place of Stuart Rabner, the former Attorney General, pursuant to Fed. R. Civ. P. 25(d)(1). This request will be granted.

1

## **BACKGROUND**

**A.**   **Factual Background**

As stated in the opinion of the Superior Court of New Jersey, Appellate Division:[2]

> The State's proofs at trial were overwhelming. At about 8:00 p.m. on October 22, 1997, Kevin Rodgers was washing his car near the corner of Oak Street and Ocean Avenue in Jersey City and talking to his friend Jerel Latimore when he saw a white Acura Integra sharply turn the corner and speed in their direction. The car stopped. Four men were in the car, and the two sitting in the front and back passenger side came out. Defendant came from the back passenger seat, pointed a dark colored gun at Latimore and Rodgers and shouted at them not to run. He was wearing a green Army fatigue waist-length coat with a drawstring and a blue skull cap. Co-defendant Thomas Bacon came from the front passenger seat holding a silver gun. He was wearing a red pullover fleece with a hood.
>
> When Latimore ran away, defendant fired a single shot at his head and killed him. Bacon kept his gun pointed at Rodgers and again told him not to move. Rodgers could not tell what happened to Latimore as he stood still with his hands up. The driver of the car, later identified as Rajhon Gerald, told defendant and Bacon to take Rodgers' neck chain. Rodgers took off the chain and handed it to Bacon. The men also demanded money from Rodgers and the keys to his car. Rodgers gave them about $100 in cash and said that the keys were in the car. Defendant went into Rodgers' car and took a cell phone and Rolodex. Bacon shot the front driver's tire, and the men jumped into their Acura and fled.
>
> Rodgers then turned and saw Latimore's body on the ground. He ran to him and said "Jerel, get up." When Latimore did not move, Rodgers ran to a friend's house down the street to call the police.

---

[2] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

At 8:36 p.m., Jersey City Police Officers Silver and Costanza were in an unmarked police car when they received a radio call that a white Acura was involved in a shooting [and] was traveling west on Communipaw Avenue. Within seconds Silver saw the Acura heading toward the intersection with Routes 1 and 9. When the car stopped at a red light, Silver drove into the northbound lane of traffic to block it. The driver of the Acura pulled around the police vehicle and ran the red light at the intersection as well as another red light 100 yards down the road as it sped away. The officers turned their car around in pursuit but lost sight of the Acura as it headed toward Kearny.

A few minutes later Anthony Teixeira was looking out of his third floor apartment window at 25 Warwick Street in Newark and saw a new, white four door car traveling the wrong way down the one way street. The car came to a sudden stop, and four black men jumped out of it and ran. The following morning Teixeira noticed that the white car was parked in the same spot. He looked inside and saw that the ignition had been broken. Suspecting that the car was stolen, Teixeira told his son to call the police.

At 8:17 a.m. Officer Robert Prachar of the Newark Police Department was dispatched to 25 Warwick Street. After he radioed the license plate number on the white Acura, [] a check revealed that it was reported stolen, the night before the murder. Inside the car were [a] handwritten letter addressed to "Jerel" and a ticket issued on October 22, 1997, at 8:08 a.m. for illegal parking at 1332 Clinton Avenue in Irvington.

On October 29, 1997, Sergeant Barry Halpern of the Irvington Police Department called Investigator John Appleyard of the Hudson County Prosecutor's Office to tell him that the FBI had defendant and Rajhon Gerald in custody on a stolen vehicle investigation and that the defendant's address was 1328 Clinton Avenue in Irvington, which was near the address on the parking summons in the Acura.

Investigators Appleyard and Coyle responded and interviewed defendant. After he was advised and waived his Miranda rights, defendant said that he stole the white Acura on October 22 along with Rajhon Gerald and two individuals named Beano and Malik. He parked it overnight in front of his home on Clinton Avenue in Irvington and saw the parking summons on the car the following morning. He said that he went shopping about 11 a.m. and saw that the car was gone when he returned at 4:00 p.m.

Defendant gave a different version of events in a taped interview an hour later. This time he said that he and Gerald had stolen the car the

3

night before the shooting. The following night he was in the car with Gerald, Gerald's cousin and Thomas Bacon. They drove around the corner of Oak Street and Ocean Avenue where they saw two men washing another white Acura. Defendant and Bacon got out of their car and told both men not to move. Defendant was holding a black .38 handgun while Bacon was holding a chrome .357. Defendant said that when one of the men started to run, Bacon shot him and went to check his pockets. Defendant then demanded that Rodgers give him money and his necklace. Rodgers gave him the $80, but he did not take Rodgers' necklace because it was not gold. He said that he then went into Rodgers' car and removed the cellular phone and the keys. They then went back to their car, and Bacon shot one of the tires of Rodgers' car. Defendant threw Rodgers' car keys out the window after they drove away. As the Acura was driving down Communipaw Avenue, an undercover police car pulled in front. Defendant and the others ran the red lights to get away and drove into Newark where they parked the car and separated. Defendant went to his home and later spent the night at a motel with his girlfriend.

Meanwhile Investigators Michael Kelly and Tim Sullivan of the Hudson County Prosecutor's Office concluded their interview of Rajhon Gerald and asked defendant if his early statement to Investigator Appleyard was true. Defendant began crying and admitted that he had not been truthful. He then gave another taped statement during which he admitted shooting the man who ran away. He said that Gerald owned the gun and that he gave it back to him later that night. He further admitted in participating in five unrelated robberies.

Kevin Rodgers made a pre-trial identification of both defendant and Bacon from a photographic array. During his trial testimony, Rodgers identified defendant as the man who had emerged from the back seat of the vehicle and shot the black handgun at Jerel Latimore. Evidence was adduced that the day after the murder two calls were made from Rodgers' stolen cell phone to Bacon's Newark phone number and five calls to Rajhon Gerald's mother's pager number.

Defendant called no witnesses and presented no evidence at trial.

(Opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division"), Respondents' Appendix ("Ra") 5 (internal citation omitted)).

**B.      Procedural History**

On April 13, 1998, a Hudson County grand jury indicted petitioner (and co-defendants) on a twelve-count indictment, including charges for murder, felony murder, armed robbery, aggravated assault, receiving stolen property, eluding, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose, all in violation of New Jersey state laws.

A pretrial hearing was conducted on August 4 and 9, 1999 on petitioner's motions to suppress statements made during custodial interrogation. The motions were denied.

Petitioner was tried before a jury from October 4 to 8, 1999 and found guilty of all charges.

On December 10, 1999, petitioner was sentenced. He filed an appeal. The conviction was affirmed on October 29, 2001, but the case was remanded for resentencing. On November 29, 2001, petitioner was sentenced to a life term with a 30-year period of parole ineligibility. The New Jersey Supreme Court denied petitioner's petition for certification on January 24, 2002.

On March 14, 2002, petitioner filed a pro se petition for post-conviction relief ("PCR"). Counsel was appointed and after a hearing, the petition was denied on April 12, 2004. The Appellate Division affirmed the denial on November 1, 2005. The New Jersey Supreme Court denied petitioner's petition for certification on January 26, 2006.

Petitioner filed a habeas petition in this District Court on May 30, 2006. It was eventually dismissed, without prejudice, on February 21, 2007.

Petitioner filed this habeas petition on May 7, 2007. On July 12, 2007, petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000). An order to answer was issued and respondents filed an answer to the petition on September 27, 2007.

Petitioner asserts the following claims in this habeas petition:

Ground One: Petitioner's convictions must be reversed because he was denied his constitutional right to effective assistance of counsel.

Ground Two: The trial court erred in admitting petitioner's statements and the lower court should have therefore granted petitioner's PCR petition.

Ground Three: Trial Counsel failed to properly consult with defendant about the possibility of a plea agreement.

Ground Four: Trial Counsel failed to investigate alibi witnesses and assert an alibi defense.

Ground Five: Trial Counsel failed to properly challenge the admissibility of petitioner's statements.

Ground Six: Cumulative Errors by counsel amounted to ineffective assistance of counsel.

Ground Seven: The lower court erred in denying the petition since petitioner received ineffective assistance of appellate counsel.

(Petition, ¶ 12, Addendum). In essence petitioner's claims can be described as ineffective assistance of counsel claims, and claims of trial court errors. It appears that the claims have been exhausted in the state courts. Nonetheless, this Court finds that petitioner's claims are clearly meritless. Thus, the petition will be denied.[3]

---

[3] Although a petition for writ of habeas corpus may not be granted if petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

## **DISCUSSION**

**A.     Standards Governing Petitioner's Claims.**

Section 2254 of Title 28, United States Code, provides that the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus. The statute reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court explained the application of § 2254(d)(1). The Court analyzed subsection 1 as two clauses: the "contrary to" clause and the "unreasonable application" clause. The Court held that under the "contrary to" clause, "a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. A federal court may grant the writ under the "unreasonable application" clause, if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Habeas relief may not be granted under the "unreasonable application" clause unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief. See id. at 411; see also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir.), cert. denied, Matteo v. Brennan, 528 U.S. 824 (1999). Thus, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. See Werts, 228 F.3d at 197; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

With regard to 28 U.S.C. § 2254(d)(2), a federal court must confine its examination to evidence in the record. See Abu-Jamal v. Horn, 2001 WL 1609690 at *12 (E.D. Pa. December 18, 2001). In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations. See id. Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness can be overcome only by clear and convincing evidence. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001)(citing 28 U.S.C. § 2254(e)(1)). "A finding that is well-supported and subject to the presumption of correctness is not unreasonable." Abu-Jamal, 2001 WL 1609690 at *12 (citing Duncan, 156 F.3d at 198).

Furthermore, federal habeas courts ordinarily refrain from revisiting credibility determinations as "it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review." Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001). A habeas petitioner therefore "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir.

1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### B. Ineffective Assistance of Counsel Claims

Petitioner claims that trial counsel was ineffective for failing to contest the felony murder charge, not giving an opening statement, cross-examining only five of the state's 12 witnesses, not consulting petitioner regarding a possible plea agreement, failing to investigate petitioner's alibi, and failing to challenge the admissibility of petitioner's statements. Petitioner also makes the bald assertion, without any supporting facts or arguments, that appellate counsel was ineffective.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct. See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001). Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court,

> examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense. See Strickland, 466 U.S. at 687. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. See id. at 695-96. Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim. See id. at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

In this case, the PCR court examined petitioner's ineffective assistance claims. Citing the two-pronged Strickland standard, the court, in an oral decision, found that petitioner's counsel was not ineffective. The PCR court held:

> First, as to the alibi defense, after a review of that claim, I'm satisfied that petitioner did not receive ineffective assistance of trial counsel for counsel's failure to raise an alibi defense. Faced with

overwhelming evidence against his client, including two inculpatory statements as this Court previously determined, as I previously determined were held within the compliance of Miranda, an eyewitness identification was made by the victim, forensic and other evidence, trial counsel's failure to raise an alibi defense had more to do with trial strategy and minimization of his client's involvement in the crime, rather than utter incompetence and the commission of quote "grievous errors" such that he failed to act as counsel at all, as the standard requires.

* * *

. . . this Court is satisfied that trial counsel adequately conducted a pretrial investigation.

* * *

Additionally, trial counsel expressed dismay that after a review of the evidence there was very little ammunition in favor of the petitioner at trial.  I'm using counsel's word.  Trial counsel expressed a belief that Mr. McClary was overinfluenced by his grandmother, the individuals he associated with in prison, and his co-defendants.  According to the defense counsel, and I agree, petitioner's lack of maturity and ability to see the long term ramifications of his actions by going to trial, most particularly in light of his co-defendant's plea agreement and statement, contributed greatly to the situation he faced, and not for any lack of effort on trial counsel's part.

* * *

Simply put, trial counsel was unable to counter the overwhelming amount of evidence the State proffered, as well as his inability to connect with the defendant due to the defendant's lack of appreciation, pursuant to what trial counsel was saying.

This Court is satisfied, having presided over the trial, that petitioner received very effective assistance of counsel as required under Strickland, [and New Jersey case law], and guaranteed by the U.S. and New Jersey Constitutions.  Trial counsel was, and is, an experienced attorney who represented petitioner to the best of his abilities given the circumstances.  This Court, therefore, believes that trial counsel made a reasoned decision to forego pursuit [of] an alibi defense, thereby making additional investigation to that area unnecessary.
Even accepting petitioner's position that counsel's performance was somehow deficient, there's a second prong to the Strickland test, that is, that counsel's deficient performance must have prejudiced the

outcome. To put it another way, was counsel's performance so palpably defective to render the proceedings unreliable.

The Court finds not. Even assuming the trial counsel failed to perform at a level of professional competence equal to that of other practitioners in his field, the failure to pursue an alibi defense would not have been likely to render a different outcome, and quite possibly, could have damaged the petitioner's case even more. Despite the fact that petitioner submitted a certification in support of his P.C.R., as well as two statements given by his aunt and grandmother attesting to his alibi.

This Court is satisfied that the alibi statements given by the petitioner's aunt and grandmother are fraught with self-interest and an utter denial of the facts as they existed and unfolded both before and during trial. The statements, however misguided, attempted to exonerate the petitioner, despite the overwhelming weight of credible evidence against him. Because the inclusion of this alibi defense would not have rendered a different outcome, petitioner, therefore, failed to overcome the strong presumption that trial counsel's performance was reasonable. See Strickland at 689. So it is denied as to that basis.

* * *

. . . petitioner cites no specific examples that bear out his argument. He fails to show this Court how trial counsel's failure to make an opening statement to the jury or question more than five of the State's 12 witnesses impaired petitioner's constitutional rights.

* * *

However, even if the Court were of the opinion trial counsel committed errors by not cross-examining specific witnesses or proffering a particular defense or legal strategy, thus satisfying Strickland's first prong, the argument fails again on the second prong. That is, [petitioner] cannot demonstrate that these errors were so prejudicial as to deprive the petitioner of a fair trial, one that is reliable. Therefore, petitioner is not entitled to an evidentiary hearing on this basis, and I deny it.

(See Respondents' Appendix, 11T, Transcript of PCR hearing).

The Appellate Division affirmed, finding:

After carefully considering the record and briefs, we are satisfied that all of defendant's arguments are without sufficient merit to warrant discussion in a written opinion, . . . and we affirm substantially for the

13

> reasons expressed by [the PCR judge] in his thorough and well-reasoned oral opinion of April 12, 2004. Nonetheless, we add the following comments.
>
> In our opinion affirming defendant's conviction, we noted that "[t]he State's proofs at trial were overwhelming." We also rejected on the merits defendant's claim, based on the trial record, that he had been denied the effective assistance of his right to counsel. The points now raised by defendant were all carefully considered by [the PCR judge] and in each instance, properly rejected as having no merit.

(Ra13, Appellate Division opinion, p. 3, internal citations omitted).[4]

After reviewing the record, this Court agrees with the findings of the state courts. The evidence against petitioner in this case was overwhelming. Petitioner has not demonstrated deficient representation by counsel. Additionally, petitioner has not demonstrated that anything counsel could have done with regard to the cross-examining witnesses, presenting alibi witnesses, or presenting an opening statement, would have changed the outcome of the proceedings or the serious nature of the offense.

---

[4] Petitioner had raised an ineffective assistance of counsel claim on direct appeal. Citing <u>Strickland</u>, the Appellate Division rejecting the claim, finding that "defendant fails to satisfy either part of the <u>Strickland</u> test." The Appellate Division noted the overwhelming evidence and stated that "the performance of his trial attorney was arguably the best that could be done under the circumstances. Trial strategy is a matter of professional judgment which may or may not be persuasive to a jury. A criminal defense attorney cannot defend the indefensible or be held to the standard of a miracle worker." (Ra5 at p. 8, internal citations omitted).

A review of the record indicates that the claims petitioner asserts against counsel deal with trial strategy of defense counsel. The witnesses who were not cross-examined testified about the stolen status of the car, the towing of the car after it was abandoned, forensic evidence regarding bullets, and cell phone records of victim Rodgers. However, the witnesses examined by counsel were vigorously cross examined. Likewise, the alleged alibi witnesses appeared after trial, and their statements contradicted petitioner's own statement admitted into evidence, and the testimony of victim Rodgers. Thus, this Court agrees with the findings by the state courts that the decisions by counsel were a matter of trial strategy.[5]

Thus, for purposes of habeas relief, petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The state courts correctly applied the <u>Strickland</u> federal standard to petitioner's ineffective assistance of counsel claims, and reasonably applied the facts of the case in the decisions. Thus, petitioner is not entitled to habeas relief for his ineffective assistance of counsel claims.

C. **<u>Trial Court Errors</u>**

---

[5] With regard to Petitioner's claim of ineffective assistance of appellate counsel, the Court notes that the state courts found that appellate counsel was competent under <u>Strickland</u>. Based on a review of the record, this Court will not upset that finding.

Petitioner argues that the trial court erred in admitting statements and in denying the pretrial motion to suppress his statements.  Petitioner contends that the state did not meet its burden of proof, and that the state failed to produce the testimony of any witnesses concerning his interrogation by the FBI prior to the interrogation by the state authorities.

The PCR court carefully considered this argument, extensively outlined the facts surrounding petitioner's statements, and found that the claim lacked merit.  Citing Miranda v. Arizona, 384 U.S. 436 (1966), the PCR court held that it "reviewed the evidence and the testimony in its entirety, and ruled that the statements were freely and voluntarily given."  (See 11T, at pp. 17-23).

In the PCR decision, the PCR judge described the evidence presented at the pretrial Miranda hearings:

> At trial, the admissibility of petitioner's statements was addressed in two hearings held on August 4 and August 9, 1999.  During this hearing, two detectives testified regarding the circumstances surrounding the statement. Earlier in the day, Detectives Appleyard and Coyle learned that petitioner was in F.B.I. custody on an unrelated carjacking charge.  Detective Appleyard Mirandized petitioner, for the first time, although petitioner had already been Mirandized by the F.B.I. relative to the carjacking, and [petitioner] signed a waiver of rights form before proceeding with the questions.
>
> Thereafter, Detective Appleyard learned that petitioner's co-defendant, Rajohn Gerald, was making statements that implicated the petitioner in the shooting.  The detectives stopped the questioning, re-Mirandized petitioner, had him sign another waiver form.  Thereafter, the detective began to question petitioner about his involvement in the shooting death of Jerel Latimore.  After the second waiver of rights form was signed, petitioner provided more information about his involvement in the shooting, although at that point, he placed blame on another co-defendant, Thomas Bacon.

> After a time, petitioner was brought back to the Duncan Avenue homicide station, where he was questioned. About 12 hours had elapsed from the beginning of the questioning.
>
> The detective also testified the petitioner was fed and able to use the bathroom facilities. Shortly after petitioner's arrival at Duncan Avenue he was re-Mirandized, and although no waiver form was signed, he agreed to go on tape and indicated he wanted to give a more truthful statement.
>
> Detective Kelly did not have the petitioner sign a fourth waiver of rights form because petitioner had already signed one with the F.B.I. and Detective Appleyard. The other detective then took the taped statement, wherein petitioner stated that I would like to give another statement to tell the truth, and I would like to get it straightened out. ... Thereafter, he detailed the events of October 22, 1997, and his role as the shooter.

(11T at pp. 19-21). The PCR judge noted his decision after the pretrial hearings, finding that the officers were credible, the state had met its burden, and the petitioner was appropriately "Mirandized," the statements were freely given, and were admissible in court. (11T at p. 22).

Petitioner's allegation that the trial judge erred in finding that the statement was voluntary, and erred in reaffirming that finding on the PCR motion, lacks merit. The state courts invoked the correct law, discussed the "totality of the circumstances" (11T at p. 19), held two pretrial hearings pursuant to <u>Miranda</u>, and reasonably determined the facts in light of the evidence presented. Based on a review of the record, including the pretrial <u>Miranda</u> hearings, this Court can fathom no reason to upset the findings of the state court. See <u>Fahy v. Horn</u>, 516 F.3d 169, 196 (3d Cir. 2008) (state court decision to reject petitioner's request for suppression was not "contrary to" Supreme Court precedent, as state court adhered to the "totality of circumstances" standard; further, "the suppression court was entitled to make the credibility determination that it

did in the face of conflicting testimony, and it applied the correct law to its findings of fact and came to a reasonable conclusion").

Petitioner has not demonstrated that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Accordingly, this ground for a writ of habeas corpus will be denied.

## **CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, is denied.  The Court further finds that no certificate of appealability will issue because petitioner has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253.

An appropriate Order accompanies this Opinion.


/s/ Katharine S. Hayden
KATHARINE S. HAYDEN
United States District Judge

Dated:  April 24, 2008